We'll continue with the morning's arguments in Appeal No. 25-1896, James Wenzler v. United States Coast Guard and others. Mr. Bugney, nice to see you. It's nice to see you, Your Honor. May it please the Court, I have the privilege of representing Mr. Wenzler, who's here in the audience right now, and this case stems from his 15 years working with the Coast Guard Auxiliary. In those 15 years, he paid his dues on time. He volunteered and filled all of his duties admirably. In those 15 years, in 2022, he posted on LinkedIn. He posted on LinkedIn on a public matter expressing his views. On his post, he had a disclaimer saying, these are my views and my views only. And his post went to matters of public concern of his own private thoughts that are protected under the First Amendment. Despite the fact that the First Amendment covers his right to speak on matters of public concern, he was disenrolled from the Coast Guard Auxiliary. The District Court, in upholding that disenrollment and denying his claims, committed three core errors. The first is it flipped the burden. That's very clear, reading its order. The burden was placed upon Mr. Wenzler and not upon the Coast Guard, but he is a respondent to the motion for summary judgment. Second, it looked at the Coast Guard Auxiliary as a paramilitary organization that would have the same need for command as a military or a prison guard. And from the record, that is so clear. This is a volunteer organization with no true hierarchy that rests upon the government, the consent of the governed. When we're looking at whether or not the deference is due as a paramilitary organization, do we look to what the organization is actually doing or statutorily what it might be called to do? I think the answer is both. So I think you have to look at statutorily. That's going to define the parameters. If you were to go ultra vires and say like, look, even though statutorily you do X, we're really looking in the day-to-day operations are much more intense than what the statute would provide. Because statutes can always be very vague. And then within the implementation of those statutes, if there is that sort of hierarchy, then I would say yes, it would bode that way. But here, the record is complete when it comes to the statute. The statute is very, very clear as to what the, this is not a paramilitary organization. And when it comes to Mr. Wenzler and what they're doing, it's also very clear that the record does not support this being a paramilitary organization. So I think you can look at both, but I think looking right here on this record, there is no way to find that this is a paramilitary organization. Go ahead, Your Honor. On this line of thinking, I don't know that the, I know where that phrase is coming from, but does it turn upon a buzz phrase like that? Because I, in my mind, I think I don't know exactly what a paramilitary organization is, but it does seem clear to me in keeping with Judge Kollar's question that it is a component of an affiliate with an affiliate of the United States Coast Guard. Correct. And the reason that I say that is, and I don't think you fight this, or I don't think you challenge this, is that when you look at the statutory scheme as a whole, the commandant of the Coast Guard can call the auxiliary into service if need be, and presumably the President of the United States could. I agree. As commander in chief. That sure makes it look to me like it's an affiliate of the Coast Guard. Okay, in your briefing, and again, it's not about word choice here and there, it's the content of it. You all seem to cast it more as a fraternity, almost like a social club. A group of volunteers that have a common interest in boating. That doesn't seem to align at all with the statute. I think it does align. You have the ultimate authority of the ability to be called in, right? But then the day-to-day operations fit completely with the way we framed it, because Mr. Wensler has firsthand experience with that. Doesn't that go back to Judge Kollar's question about why shouldn't we determine what the U.S. Coast Guard auxiliary is by examining its enabling statute? Why isn't that the proper reference point? He may have experienced it in less formal ways. I understand that. But as a legal matter, why don't we analyze it in terms of the statute? So my answer was yes, you would. You would look at both. And I think if you look at the statute, you have both the commander in chief aspect, and you have the commandant. But then you're not allowed to have a weapon. You're not allowed to call yourself a veteran. You're not allowed to do anything that would otherwise be with the military. And that other aspect, I think this is the key aspect to this, is there's no chain of command where it's like, look, you've got to go do that or else. Instead, it rests upon this idea that it's a volunteer organization that's the consent of the volunteers. That takes it outside the normal realm. So if the commander in chief says, hey, I need you to go out there and go to the Straits in Iran, you'd be like, no, I'm not doing that. The volunteer has that aspect of it. And so that takes it outside of the military aspect. You're not allowed to have a weapon. You're not allowed to have any of those. So if you look at the statute holistically and don't just put the thumb on the scale of, look, you have a commandant, and you have the commander in chief, well, then it favors us completely. And I agree with you that we've used buzzwords. And I don't know what paramilitary means. That's why we went to the dictionary and we're like, it doesn't make sense. Instead, the way I think the property will look at it, to answer your question, is it goes a lot to pickering step two. What is the necessity of this? How is this going to be disruptive? I think, and again, I'm not trying to use buzzwords, but you go with somebody in the DOC, Department of Corrections, you go to that sort of firefighters, that kind of directly undermines. You need that confidence. You need that camaraderie. And so that is part of the balancing. It's the same way that it was in Connick. You know, like the district attorney's office, look, the district attorney, head district attorney says, go to the juvenile division and try this case. You got to go try that case. Do you agree that the Coast Guard would qualify as a paramilitary organization under this framework? Can I just push back? It's a military organization. I think it's a complete military organization. So I wouldn't say paramilitary. So the auxiliary, the statute makes clear, the manual makes clear, is there to assist the Coast Guard. Why wouldn't that carry over? I think it's too far adjacent, especially when you have the volunteer. It'd be almost like saying the USO. You know, the USO supports the military with its morale, but it's, you know, we're not saying that Bob Hope, I know he's dead, but I couldn't think of another USO person. Like a performer is somehow held to that exact same standard that we're like, look, you got to go there and this is why we have this military aspect of it. But I think that also goes, Your Honor, to the idea of pickering too, the second step of pickering. What are we really looking at here? Because once you take it outside the buzzword of paramilitary and just analyze it under an ordinary set of circumstances, you have to say that Wensler's speech is not disrupting anything within the Coast Guard. There's not that evidence. There's nothing that they've put forward. Does it have to actually disrupt or have the potential to disrupt under the law? I think that under the law, it's the reasonable, there has to be a reasonable opportunity for it to disrupt. And I think that. So I don't think it has to actually disrupt. Correct. I think Hicks is a perfect example. Nobody had actually said, hey, I think that Hicks is terrible within the prison community. But everybody recognized that you're going to have a lot of Muslim inmates in there. And like that has the potential. It's not too far away. The same with the teachers, right? Like the Darnish or whatever it is. Well, none of the students had immediately said, look, we want her out of here. But instead, everybody in the school board was like, look, this is going to cause ripples. And it's very reasonable for us to think that these ripples are going to impute upon your job. Here we have one complaint by an anonymous person who didn't even care enough to go and sit for the interview. We have nothing within his personnel file. We have nothing that comes and says, hey, all everybody else within your squad, your flotilla, is somehow looking at you askew. They think that you're a racist. They think you're terrible. You do have a directive for him to stop posting and putting it, having his uniform on there, which I think the record suggests he agreed to at first and then didn't. That goes a long way in pickering step two. You have you have another member of the Auxiliary saying that this doesn't make us look too good and it's not appropriate. And you're the one you started with some pretty compelling I'll give you, you know, First Amendment language, but you're leaving off. He's the one who chose to have the uniform on as he's saying it. And it's a different analysis to me. If there is no uniform on, if he doesn't make that decision, if he's not the one bringing in the Coast Guard Auxiliary and then having an interaction with another member of the Coast Guard Auxiliary and kind of not agreeing to do what was suggested. So I think there's a lot to unpack in that question. I mean, that's their best argument. That was compound. I would have been. No, no. You are the judge, though. So but to the first point, well, that takes a little bit of the but for causation. Right. But for his original post, none of this is happening. Right. It's not that they're actually disciplining him because of the content of his post. That's First Amendment protected. Right. As to him wearing the uniform and everything else. Well, if he wasn't, then we wouldn't even be here. Right. That goes to the sixth step in pickering that we look at like, hey, was he actually putting himself out there and that these views were those of the Coast Guard? No reasonable person would think that every anybody. Sorry. Anything that you're posting on LinkedIn is somehow tied to your employer. Most of the people I clerked with, they work for the Department of Justice. Right. Nobody thinks that the Department of Justice's views are consistent with everything else that they're posting on there. They have the disclaimer and it sort of allows for that freedom. That's what pickering has. But the last point, I think, is the best point of what you made to the counter to us. Right. Is we have to look at this holistically. And holistically, it is not the content of your post. Right. They're not looking at it and saying, I'm offended by the content of your post. Instead, he's going, we had one complaint and they embraced that circular logic. Therefore, others must be complaining about it. But nobody complained from the Coast Guard about the content of that post. It was all based upon the anonymous complainer on Facebook. And so if you look at it that way, it doesn't tip in their favor of their, you know, in their favor. Instead, it tips in favor of us. Because the other aspect of it, and I just really want to hammer this home, they could always vote him out. No, no, there could have been. That is the other flotilla. They could go and look at it and say, geez, you know, this is kind of bad. We're going to take action under pickering. Right. We're going to take action and discipline you. They could also do it and just say, we don't think that you're a commander anymore. We don't actually think that you're a good role model for this. So when you look at it all holistically under the pickering factors, and you actually give the movement, you know, like the burden that they're supposed to hold and us, the respondent, we've put forth our prima facie case, and we should be able to present this case before a jury trial. You wanted some rebuttal time. We'll give you a couple minutes, but let's hear from the Coast Guard Auxiliary. Good morning, Your Honors. I may please the courts. I'm Robert Joyne on behalf of the Coast Guard and the Coast Guard Commandant Kevin Munday. To start, let's be clear about what the Coast Guard Auxiliary is and isn't. As Your Honors observed, under the statutory scheme, it does support the Coast Guard. It is a component of the Coast Guard. It's administered by the Commandant of the Coast Guard who can call them to service. The President of the United States could call them to service as Commander-in-Chief. Correct, Your Honor. And to be even more specific, to look beyond the statutory scheme to the Coast Guard Auxiliary Manual itself, it gives specific examples of the kinds of missions that the Coast Guard Auxiliary engages in. So those include participation in combat exercises, disaster relief, and, important for the paramilitary inquiry, safety in public-oriented missions such as search and rescue. So to be clear, if a boat capsized on Lake Michigan and the boaters were lost at sea, the Coast Guard may well be the ones to go and rescue them. So contrary to the appellant's contentions, this is not just a government-sponsored fraternity or a social club, even if Mr. Wenzler experienced it that way. Mr. Joyne, why aren't at least some of these posts matters of public concern? I'll start with the first two. The one about the Supreme Court Justice talking about racism. The Girl Scout one talking about sexism. They weren't airing personal grievances. They are matters that are discussed in the public. They're on his LinkedIn. It's a public post. I think we have to look at them one by one, and those two in particular seem to me like they fall within matters of public concern. Your Honor, we agree with the district court's analysis that they were evincing kind of personal disdain in that sense, but we do concede that they are on matters of public concern. But the, for example, the receptionist post, that one is arguably the other way. That's which is why I said I think we have to look at them one by one, not as a whole, because they do address different issues. We agree with that, Your Honor. So your stronger argument might be at step two. Yes, I think that the stronger argument is under Pickering where Mr. Wenzler did make social media posts wearing his uniform and listing his in auxiliary title, which prompted in two separate instances complaints from members of the public who regarded his speech as potentially on behalf of the Coast Guard Auxiliary and based... Mr. Joint, sorry to interrupt you, but what's the strongest evidence in the record that the posts here had the potential for disruption of the Auxiliary? Your Honor, it's the declarations from the Coast Guard and Auxiliary members who were involved in Mr. Wenzler's discipline who were explained what they were thinking at the time during the disciplinary process. So Commander Gibson, for example, notes that the social media posts could tarnish the public image of the Coast Guard Auxiliary, could hamper recruiting efforts, and because Mr. Wenzler was a Vice Flotilla Commander, which is a leadership and management position within the Auxiliary, could set a bad example for his fellow Auxiliarists and his subordinates within the Flotilla. Can I ask you just on a related point? As a factual matter, he had an unfortunate exchange by email with Commander Randall. You know what I'm talking about? Yes, Your Honor. The email? The email. Okay. He then, on LinkedIn, posted a message about the president-elect of this university. Yes, Your Honor. Did that come after the email exchange? Yes, Your Honor. The email was in response to the letter of caution, which addressed the first two LinkedIn posts that Judge St. Eve referenced. And you would agree that the post on the president of the university was at the time that it was posted on a matter of public concern? That received a lot of news attention, you may recall. Yes, we would concede that, Your Honor. So, based on the Auxiliary's reasonable predictions of disruption, and owed the deference that they are under Pickering as a paramilitary organization with a public and safety-oriented mission that relies on the esprit de corps of a kind of chain of command, the Coast Guard Auxiliary eventually disenrolled Mr. Wensler. But there's more to this case. I mean, he... There was another public complaint, or at least a complaint from the outside, right? Somebody posted on LinkedIn, at least according to your brief, that there was a question, you put this guy in charge of human resources? Correct, Your Honor. And that importantly goes to the fact that Mr. Wensler on his LinkedIn profile in the experience section was misrepresenting the job title that he had held with the Auxiliary as being a branch chief for human resources, which both the Coast Guard Auxiliary and apparently this member of the public confused as being, you know, caused the confusion that he was in charge of human resources, which is not true. But continuing on, the... The more to this case that distinguishes it, even though the Coast Guard Auxiliary would win under the Pickering balancing test, especially under this Court's decisions in Hicks and Schneider, the additional ground on which this Court could affirm the District Court's award of summary judgment is that the timeline shows that the Coast Guard Auxiliary had independent and sufficient grounds to disenroll Mr. Wensler based partly on the email that you referenced, Your Honor, disrespecting a superior officer in violation of the anti-harassment policy, misrepresenting, as we mentioned, his job title on his social media, and his refusal to comply with the initial instructions to modify his social media accounts to remove references to the Auxiliary. And these were all noted in the eventual documents that disenrolled him. Why wouldn't there at least be an issue of fact on the motivating factor question, given that the documents that the Auxiliary sent to him, the letter of caution, the disenrollment, the denial of his appeal, all reference to social media posts? They reference the social media posts insofar as they are creating the association with the Auxiliary. So the grounds on which he's being disenrolled are independent of the content of his speech. And in that sense, under this Court's decision in Bless, unless the plaintiff can rebut the non-political rationales for disenrollment, he's not being retaliated for it, in essence, the First Amendment-protected content of his speech. I don't know, I don't understand why you're relying upon the email really at all. The email is unfortunate. It doesn't reflect well on the plaintiff. But the email, to focus on the email, takes this entirely outside of the public speech, outside of Pickering altogether. Email wasn't sent to the public. The email was sent to one person. Correct, Your Honor. So that goes to the third element in the First Amendment retaliation claim in, insofar as whether his speech, the content of his speech was a motivating factor in his disenrollment. I just don't know that the, I don't know why you're, I don't know why the email has anything to do with his speech. I think the speeches are the posts on LinkedIn. Correct, Your Honor. Yes, the, but they form the basis for an independent, the email forms the basis for an independent and sufficient rationale for his disenrollment that's independent of his speech. So the Coast Guard's position is that it wins under Pickering, and in the alternative, wins under the fact that he wasn't even disenrolled for his speech. I'm about out of time, so we just asked that the court affirm the district court's award of summary judgment in favor of the Coast Guard. Okay, very well, Mr. Joint, thank you. Mr. Bugg, I'm going to give you a couple minutes of rebuttal time. Can you, would you mind addressing the, after the comment was made about the president-elect of the university, there was, there was a complaint, or a complaint, at least a concern expressed on LinkedIn. And the concern was expressed in a way that was suggesting that it doesn't make the Coast Guard look good to have somebody posting messages like this on LinkedIn. I agree. That's the sentiment of the, of the post, or the complaint. There's no question that that's the sentiment. I think that actually is the heckler's veto. And, you know, it might be the correct heckler's veto that like, hey man, you don't talk about somebody who has cancer like that. But that is the heckler's veto, saying we have one person who's really says like, this is not good. And all they've done is just, you know, posted on LinkedIn a single sentence. This doesn't make you look good. But that doesn't go to what we're really looking at. What we're looking at is not whether it puts Mr. Wenzler in a poor light, but whether it's going to interfere with his job duties, whether it's going to with what he does. That's what Pickering's looking at. Not whether somebody else could disagree with his statement, because it's a matter of public concern. It was highly publicized, and he's allowed to put that out there. It still has to be analyzed under the seven factors. And so you can't just have the one. Does that answer your question? It's responsive. Thank you. Yeah. I think there's a couple of things. So when it comes to the search and rescue, it's not that, you know, the search and rescue is, is it going to interfere with the actual, you know, what you're supposed to do on the high seas of Lake Michigan? No, his views on affirmative action aren't going to interfere with what he does out there. And it's not going to be something that where somebody who is boatwrecked, or I don't know if that's the right term, you know, is actually like, hey, I don't want that guy rescuing me. That's what the interference is. And that you don't have here. Does the interference, though, have to be linked to the content as opposed to the actual doing it? The act of posting something that could bring disarray against or taint the auxiliary in some way? Well, I think that's a separate issue in HICS, right? Like the third aspect of pickering, is it going to interfere with your job duties? And so I think if you look at HICS... I understand that, but I don't know that it has to be linked to the exact content as to whether or not the content would interfere with the job duties. Oh, I can see. I agree with that point. Yes, I agree as that matter. Just two other quick points. I just want to point out, when it comes to the directorate and the director, we screenshotted in exactly what the interrogatory was on page 10 of our reply brief. He didn't misrepresent anything. He just made it more official, saying directorate instead of director. And the last point I would say, Your Honor, is it is an issue of fact. If they're going to stand upon this and say that we would have disenrolled them because of everything else, that's an issue of fact that a jury needs to hear. So for those reasons, Your Honor, we'd ask that it be reversed. Mr. Bugney, thank you very much. Mr. Joint, thank you as well. We'll take the appeal under advice.